**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

*Counsel for Plaintiff IBEW Local 353
Pension Plan*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IBEW LOCAL 353 PENSION PLAN, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>EARGO, INC., CHRISTIAN GORMSEN, ADAM LAPONIS, JOSH MAKOWER, JULIET BAKKER, PETER TUXEN BISGAARD, DOUG HUGHES, GEOFF PARDO, NINA RICHARDSON, A. BROOKE SEAWELL, DAVID WU, J.P. MORGAN SECURITIES LLC, BofA SECURITIES, INC., WELLS FARGO SECURITIES, LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>        Defendants. | Case No. 3:21-cv-8747<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiff IBEW Local 353 Pension Plan ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Eargo, Inc. ("Eargo" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Eargo; and (d) other public information regarding the Company.

## I.    <u>INTRODUCTION</u>

1.    This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired: (a) Eargo shares in or traceable to the Company's initial public offering of common stock conducted on or around October 15, 2020 (the "Offering"); and/or (b) shares of Eargo common stock between October 15, 2020 and September 22, 2021, inclusive (the "Class Period").

2.    The claims asserted herein are alleged against Eargo and certain of the Company's officers, current and former members of Eargo's Board of Directors, including the directors that signed the Registration Statement (defined below) for the Offering, and the underwriters of the Offering (collectively, "Defendants"), and arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.    Eargo is a medical device company that manufactures and sells hearing aids directly to consumers with mild to moderate hearing loss.  Coverage of the Company's products by third-party payors (*i.e.*, insurance companies) and reimbursement that such payors provide the Company for its products are critically important to Eargo's revenue growth.

4.    In the Offering Materials (defined below) issued in connection with the Offering and throughout the Class Period, Eargo made numerous materially false and misleading representations concerning the extent of available insurance coverage for Eargo's products and how that coverage purportedly drove the Company's earnings and growth.  Eargo represented that

insurance coverage for its products was critical, in part, because insurance customers returned products at lower rates than other customers, which further bolstered the Company's revenues. In addition, the Company touted its advertising as a key source of growth among insurance customers, including ads directly targeting federal employees and retirees, which purportedly grew Eargo's customer base at a low marginal cost. Moreover, Eargo directly tied its positive financial guidance to its insurance customer base, touting insurance customers as an important revenue driver that accounted for 45% of the Company's sales volume.

5.      These and similar statements made throughout the Class Period were false. In truth, insurance coverage could not drive Eargo's revenues and growth because insurers do not cover claims for Eargo's products at the level the Company represented to investors. Moreover, contrary to repeated representations that insurance customers were a sustainable driver of Eargo's financial results, a substantial portion of insurance claims Eargo submitted were likely improper and may have constituted a fraud on the U.S. federal government, which has triggered a criminal investigation of the Company by the U.S. Department of Justice ("DOJ"). As a result of these misrepresentations, shares of Eargo common stock traded at artificially inflated prices throughout the Class Period.

6.      The truth began to emerge on August 12, 2021, after the market closed, when Eargo revealed that claims Eargo submitted to its largest third-party payor had not been paid since March 1, 2021, while that third-party payor was conducting a claims audit. These deferred payments caused Eargo's accounts receivable to grow significantly over prior periods. As a result of these disclosures, the price of Eargo stock declined by $8.00 per share, or over 24%, from $32.70 per share to $24.70 per share. Despite these disclosures, however, Eargo downplayed the significance of the claims audit and provided investors with false assurances about the strength of the Company's insurance-derived revenues and growth prospects.

7.      Then, on September 22, 2021, after the market closed, Eargo disclosed that insurance claims it submitted on behalf of certain customers may have constituted a fraud on the U.S. federal government. Specifically, Eargo revealed that the DOJ launched a criminal investigation of the Company related to insurance reimbursement claims that Eargo submitted on

behalf of customers covered by federal employee health plans.  As a result of the DOJ's criminal investigation of the Company, Eargo withdrew its 2021 financial guidance.  These disclosures caused the price of Eargo stock to decline by an additional $14.81 per share, or over 68%, from $21.67 per share to $6.86 per share—a decline of nearly 62% from Eargo's Offering price of $18.00 per share.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and other Class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.    Venue is proper in this District under Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b), (c), and (d). Eargo maintains its headquarters in San Jose, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  PARTIES

### A.   Plaintiff

11.    Plaintiff is a multi-employer defined benefit pension plan that manages nearly CAD$2 billion in assets on behalf of its active members, retirees, and beneficiaries.  As indicated

in the certification submitted herewith, Plaintiff purchased shares of Eargo common stock at artificially inflated prices during the Class Period, including shares purchased in and/or traceable to the Offering, and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.     Corporate Defendant**

12.     Defendant Eargo is a medical device company, focused on the development and sale of hearing aids.  Incorporated in Delaware, the Company maintains its corporate headquarters at 1600 Technology Drive, San Jose, California.  The Company is the issuer of the shares sold in the Offering.  Eargo's common stock trades on NASDAQ under ticker symbol "EAR."  As of September 14, 2021, Eargo had over 39 million shares of common stock outstanding, owned by hundreds or thousands of investors.

**C.     Officer Defendants**

13.     Defendant Christian Gormsen ("Gormsen") is, and was at all relevant times, Eargo's President and Chief Executive Officer ("CEO") and a Director of the Company. Defendant Gormsen signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

14.     Defendant Adam Laponis ("Laponis") is, and was at all relevant times, Eargo's Chief Financial Officer ("CFO").  Defendant Laponis signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

15.     Defendants Gormsen and Laponis are collectively referred to hereinafter as the "Officer Defendants."  The Officer Defendants, because of their positions with Eargo, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of

their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### D.   Director Defendants

16.     Defendant Josh Makower ("Makower") is, and was at all relevant times, Chairman of the Board of Directors of Eargo.  Defendant Makower signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

17.     Defendant Juliet Bakker ("Bakker") served as a Director of Eargo from July 2020 to June 9, 2021.  Defendant Bakker signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

18.     Defendant Peter Tuxen Bisgaard ("Bisgaard") is, and was at all relevant times, a Director of Eargo.  Defendant Bisgaard signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

19.     Defendant Doug Hughes ("Hughes") is, and was at all relevant times, a Director of Eargo.  Defendant Hughes signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

20.     Defendant Geoff Pardo ("Pardo") served as a Director of Eargo from July 2020 to July 31, 2021.  Defendant Pardo signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

21.     Defendant Nina Richardson ("Richardson") is, and was at all relevant times, a Director of Eargo.  Defendant Richardson signed the Registration Statement for the Offering and

is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

22.     Defendant A. Brooke Seawell ("Seawell") is, and was at all relevant times, a Director of Eargo. Defendant Seawell signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

23.     Defendant David Wu ("Wu") is, and was at all relevant times, a Director of Eargo. Defendant Wu signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offering.

24.     Defendants Makower, Bakker, Bisgaard, Hughes, Pardo, Richardson, Seawell, and Wu are collectively referred to hereinafter as the "Director Defendants." The Officer Defendants and the Director Defendants are collectively referred to hereinafter as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement for the Offering. In addition, as Directors and/or executive officers of the Company, the Individual Defendants participated in the solicitation and sale of Eargo shares to investors in the Offering for their own benefit and the benefit of Eargo. The Individual Defendants, because of their positions with Eargo, possessed the power and authority to control the contents of the Offering Materials.

### E.     Underwriter Defendants

25.     Defendant J.P. Morgan Securities LLC ("JP Morgan") served as an underwriter and joint book-running manager of the Offering. As an underwriter of the Offering, JP Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

26.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter and joint book-running manager of the Offering. As an underwriter of the Offering, BofA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

27.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter of the Offering.  As an underwriter of the Offering, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

28.     Defendant William Blair & Company, L.L.C. ("William Blair") served as an underwriter of the Offering.  As an underwriter of the Offering, William Blair was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

29.     Defendants JP Morgan, BofA, Wells Fargo, and William Blair are collectively referred to hereinafter as the "Underwriter Defendants."

**IV.    BACKGROUND**

30.     Based in San Jose, California, Eargo is a medical device company that manufactures and sells hearing aids directly to consumers with mild to moderate hearing loss.  The Company claims that its hearing aids "are the first and only virtually invisible, rechargeable, completely-in-canal, FDA-regulated, exempt Class I and Class II devices for the treatment of hearing loss."  Eargo advertises heavily in various media and touts the availability of insurance coverage for its products as a primary selling point, and offers to process insurance claims on behalf of its customers.

31.     In October 2020, the Company conducted the Offering, in which it ultimately offered and sold over 9 million shares of Eargo common stock at a price of $18.00 per share, reaping nearly $163 million in gross proceeds.

**V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS**

32.     The Class Period begins on October 15, 2020, when the SEC declared Eargo's Registration Statement for the Offering effective.  On or around October 15, 2020, Eargo conducted the Offering pursuant to a registration statement that the Company filed with the SEC on September 25, 2020, and which, after three amendments, was declared effective by the SEC on October 15, 2020 (the "Registration Statement").  On October 19, 2020, Eargo filed a prospectus

for the Offering with the SEC on Form 424B4 (the "Prospectus"), which formed part of the Registration Statement (collectively, the "Offering Materials"). The Registration Statement was signed by the Individual Defendants. By means of the Offering Materials, Eargo offered and sold more than 9 million shares of common stock (which included the underwriters' exercise in full of their option to purchase an additional 1.18 million shares of common stock) at $18.00 per share, resulting in over $162.5 million in gross proceeds for the Company.

33.     The Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents. Specifically, in the Offering Materials, Defendants repeatedly pointed to insurance coverage as a key driver of revenues and growth for the Company. For example, the Offering Materials represented that "the increase in customers with insurance coverage has been a significant driver of our growth in 2020" and that the Company's "differentiated, consumer-first business model" included "provid[ing] insurance claims processing for customers, eliminating in most cases the need for customers to interface with their insurance providers." The Offering Materials further stated that Eargo "[o]ptimize[d] customer mix" by increasing the portion of its customers with insurance coverage, who "typically convert at higher rates and return their devices at lower rates, due . . . to having reduced or, in some cases, no out of pocket cost" and that the Company's increased sales volumes in the period preceding the Offering were "driven by expanded national advertising [and] growth in customers with health insurance coverage."

34.     Moreover, in the "Risk Factors" section of the Prospectus, the Company purported to warn that "[c]hanges in third-party coverage and reimbursement may impact our ability to grow and sell our products." Eargo further stated that it faced ostensible risks regarding third-party coverage and reimbursement that "could decrease for our products, which could reduce our market share" and "may never become available to us at sufficient levels."

35.     The statements set forth above in ¶¶33-34 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Eargo's insurance

customers were not a sustainable driver of the Company's financial results because insurers would not cover claims for Eargo's products at the level the Company represented to investors.  In addition, a substantial portion of insurance claims that Eargo submitted to its largest third-party payor were improper and were reasonably likely to lead to regulatory scrutiny and negatively impact the Company's financial results.  As a result, Defendants' positive statements about Eargo's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.  In addition, to the extent the Company purported to warn of risks related to third-party payor coverage and reimbursement for Eargo's products, Defendants omitted that such risks had already materialized.

36.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  The failure of the Offering Materials to disclose the ongoing trend that the actual insurance coverage for Eargo's products was falling far below what the Company had led investors to believe violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income for continuing operations.  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  The failure of the Offering Materials to disclose the true extent of insurers declining to cover claims and provide reimbursement for Eargo's products violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Eargo shares speculative or risky.

37.     On November 19, 2020, Eargo held its first earnings call with analysts and investors as a public company to discuss the Company's financial results for the third quarter ended

September 30, 2020.  During the call, Eargo's President and CEO, defendant Gormsen, stressed that "[w]e deliberately designed the Eargo business model to generate growth at the lowest cost of acquisition possible" and "[w]e have achieved that efficiency by diversifying our customer base beyond traditional out-of-pocket payment into the insurance market."  Defendant Gormsen further represented that insurance customers "generally convert at higher rates and return at lower rates, which has the multiplying benefit of driving up net revenue growth" and "[w]e expect this positive mix shift toward more insurance . . . to be a key driver of growth and scalability going forward."  Defendant Gormsen also touted the Company's "targeted efforts" to advertise to retired federal employees as "a great opportunity" that "worked well for us," emphasizing that "we deliberately leveraged these investments in TV and other awareness media" to reach insurance customers, who "may see a national Eargo ad that educates them on the possibility of a hearing aid benefit and call us or go to our website. . . .  Just give us your insurance . . . and we do the rest."

38.     On November 20, 2020, Eargo filed its quarterly report with the SEC on Form 10-Q for the third quarter ended September 30, 2020 (the "Q3 2020 10-Q"), affirming the previously reported financial results.  In the Q3 2020 10-Q, Eargo purported to warn that "[c]hanges in third-party coverage and reimbursement may impact our ability to grow and sell our products."  The Company further stated that it faced ostensible risks regarding third-party coverage and reimbursement that "could decrease for our products, which could reduce our market share" and "may never become available to us at sufficient levels."

39.     On January 12, 2021, defendants Gormsen and Laponis participated in the JP Morgan Healthcare Conference on behalf of Eargo.  During the conference, in response to an analyst's question about the Company's profitability potential, defendant Laponis represented that "as customer segments between cash pay, insurance, and then, of course, repeat evolve, there's a natural tailwind that exists, both the ability to drive that awareness in insurance and the ability for that to convert better" and thus Eargo could purportedly grow its customer base "at a lower cost of acquisition."

40.     On February 25, 2021, Eargo issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2020.  In the press release, which was also

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:21-cv-8747                                                                                    10

filed with the SEC on Form 8-K, defendant Gormsen stated that "[o]ur momentum through 2020 continued to accelerate in the fourth quarter with net revenue growth above 110% year over year" which "was driven by strong performance of our national advertising, better than expected sales to customers with insurance coverage, and robust consumer demand during the holiday buying season." Defendant Gormsen further represented that "[t]he improved mix of customers contributed to gross margin of 70.6%, return accrual rate of 24.4% and non-GAAP sales and marketing as a percentage of revenues, of 64.6%, all company records" and "[w]e are very pleased with this execution and believe our ability to achieve both growth and efficiency demonstrates the scalability of our business model." In the press release, Eargo also represented that it expected to achieve between $87 million and $93 million in net revenue for 2021.

41. That same day, Eargo held an earnings call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year ended December 31, 2020. During the call, defendant Gormsen emphasized "the magnitude of insurance orders we received as a result of holiday advertising" and touted the Company's insurance customers as "a multiyear runway to continued efficient growth." Defendant Gormsen also affirmed the Company's net revenue guidance for the full year of 2021 in the range of $87 million to $93 million, which he stated was "based on what we have already done," including "driving demand through advertising. That's point number one. How we can continue to penetrate the federal insurance opportunity, that's driving a big part of our growth." In addition, defendant Gormsen represented that Eargo's "[i]ncreased national advertising also attracted an increased number of insurance customers, enabling continued penetration of a large, fast growing, and mostly untapped segment of the hearing aid market."

42. During the same call, defendant Laponis represented that "in the back half of 2020 . . . roughly 45% of the volume came from insurance," and "[t]he way we're modeling 2021 is basically a continuation of that similar behavior . . . and we expect the mix to be kind of weighted towards about 45% insurance throughout the year." Defendant Laponis further represented that Eargo's "9.6 point year-over-year reduction in our return rate was driven by the mix shift in volumes towards lower returning insurance" customers.

43.     On March 16, 2021, Eargo filed its annual report with the SEC on Form 10-K for the year ended December 31, 2020 (the "2020 10-K"), affirming the previously reported financial results.  In the 2020 10-K, Eargo purported to warn that "[c]hanges in third-party coverage and reimbursement may impact our ability to grow and sell our products."  The Company further stated that it faced ostensible risks regarding third-party coverage and reimbursement that "could decrease for our products, which could reduce our market share" and "may never become available to us at sufficient levels."

44.     On May 12, 2021, Eargo issued a press release announcing its financial results for the first quarter ended March 31, 2021.  In the press release, which was also filed with the SEC on Form 8-K, defendant Gormsen stated that "[w]e started 2021 with a great first quarter, as our digital and offline marketing programs continued to drive demand across multiple customer types, including both cash pay and insurance customers producing 74% year-over-year growth" and "[o]ur mix shift towards insurance customers also resulted in a lower return accrual rate of 23.2%, which combined with higher average selling prices, drove non-GAAP gross margin to 72.2%." Defendant Gormsen further represented that "[o]ur strong start to the year gives us increased confidence in our ability to deliver our full year revenue and gross margin guidance, while driving innovation across our value chain."  In the press release, Eargo also announced that it had increased its net revenue guidance for 2021 to a range of $89 million to $93 million, up from the previously communicated range of $87 million to $93 million.

45.     That same day, Eargo held an earnings call with analysts and investors to discuss the Company's first quarter 2020 financial results.  During the call, defendant Laponis discussed the Company's increased full year 2021 net revenue guidance to a range of $89 million to $93 million, up from $87 million to $93 million, which he attributed to Eargo's "high degree of confidence in our abilities to drive growth," including "stable return accrual rates."  Defendant Laponis further assured investors that "the team's approach has always been let's put into guidance things we know we can achieve."  During the call, defendant Gormsen similarly represented that "everything that we've done from a guidance point of view since we started exploring the public

1   markets" has been "base[d] on what we've seen historically" and touted Eargo's "insurance

2   opportunity" as a key, but "large and under penetrated," driver of growth for the Company.

3       46.     On May 13, 2021, Eargo filed its quarterly report with the SEC on Form 10-Q for

4   the first quarter ended March 31, 2021 (the "Q1 2021 10-Q"), affirming the previously reported

5   financial results.  In the Q1 2021 10-Q, Eargo purported to warn that "[a] significant portion of

6   our revenue is dependent upon reimbursement from third-party payors" and "[a]ny material

7   changes to third-party coverage or reimbursement could significantly impact our business and our

8   ability to grow and sell our products."  The Company further represented that "[i]f we fail to

9   maintain access to existing levels of coverage and reimbursement for our products, our business

10  and operating results could be adversely affected."

11      47.     Regarding third-party payors, the Q1 2021 10-Q stated further that such payors

12  "periodically conduct pre- and post-payment reviews, including audits of previously submitted

13  claims, and we are currently experiencing and may experience such reviews and audits of claims

14  in the future," including that the Company was "currently subject to a routine audit with our largest

15  third-party payor, who accounted for approximately 57% of the Company's gross accounts

16  receivable as of March 31, 2021."  The Q1 2021 10-Q also stated that reviews and audits of Eargo's

17  claims by third-party payors "have resulted and could in the future result in significant delays in

18  payment, and could result in material recoupments of previous claims paid or denials of pending

19  or future claims" and this, in turn, "could impact our ability to recognize revenue, reduce our net

20  sales and profitability, or result in the loss of our ability to submit claims to certain third-party

21  payors for payment."

22      48.     The statements set forth above in ¶¶37-47 were materially false and misleading and

23  failed to disclose material facts necessary to make the statements made, in light of the

24  circumstances in which they were made, not false and misleading.  In truth, Eargo's insurance

25  customers were not a sustainable driver of the Company's financial results because insurers would

26  not cover claims for Eargo's products at the level the Company represented to investors.  In

27  addition, a substantial portion of insurance claims that Eargo submitted to its largest third-party

28  payor were improper and were reasonably likely to lead to regulatory scrutiny and negatively

impact the Company's financial results.  As a result, the positive statements made by Eargo and the Officer Defendants about the Company's business, operations, and prospects, including its 2021 financial guidance, were materially misleading and/or lacked a reasonable basis.  In addition, to the extent the Company purported to warn of risks of with regard to insurance coverage and reimbursement for Eargo's products, Eargo and the Officer Defendants omitted that such risks had already materialized.

## VI.   **THE TRUTH EMERGES**

49.     The truth began to emerge on August 12, 2021, after the market closed, when Eargo disclosed that an insurance company that is Eargo's "largest third-party payor, who accounted for approximately 80% of [the Company's] gross accounts receivable as of June 30, 2021," was conducting a claims audit and had not paid Eargo on any claims since March 1, 2021.  As a result, Eargo's accounts receivable had grown significantly over prior periods.  In addition, the Company also revealed that claims Eargo submitted to another insurance company for reimbursement were being audited.  These disclosures caused Eargo's stock price to decline by $8.00 per share, or over 24%, from $32.70 per share to $24.70 per share.

50.     Despite these disclosures, however, Eargo and the Officer Defendants continued to misrepresent the extent and severity of the claims audit and falsely assured investors about the strength of Eargo's insurance-derived revenues, even raising the Company's 2021 financial guidance.  Specifically, on August 12, 2021, Eargo issued a press release announcing its financial results for the second quarter ended June 30, 2021.  In the press release, which was also filed with the SEC on Form 8-K, Eargo announced that it had raised its 2021 net revenue guidance to between $93 million and $96 million from its previously communicated range between $89 million and $93 million, which the Company attributed to "[k]ey revenue growth drivers," including "continued growth of insurance customers."

51.     The same day, during Eargo's earnings call with analysts and investors to discuss the Company's financial results for the second quarter ended June 30, 2021, defendant Laponis described the claims audit as "pretty common" and assured investors that "all the claims we submitted are valid [and] reimbursable," and the insurer—identified only as "a large payor that's

basically administrating on behalf of the federal government"—was only focused on "requested documentation," and not the propriety of the claims.  Moreover, during the call, defendant Gormsen stated that the claims audit merely represented "an educational process" for the insurer "that gives us the opportunity to further broaden our insurance coverage."

52.     Moreover, on August 12, 2021, Eargo also filed its quarterly report with the SEC on Form 10-Q for the second quarter ended June 30, 2021 (the "Q2 2021 10-Q"), affirming the previously reported financial results.  In the Q2 2021 10-Q, Eargo purported to warn that "[a] significant portion of our revenue is dependent upon reimbursement from third-party payors" and "[a]ny material changes to third-party coverage or reimbursement could significantly impact our business and our ability to grow and sell our products."  The Company further represented that "[i]f we fail to maintain access to existing levels of coverage and reimbursement for our products, our business and operating results could be adversely affected."

53.     Regarding third-party payors, the Q2 2021 10-Q stated further that such payors "periodically conduct pre- and post-payment reviews, including audits of previously submitted claims, and we are currently experiencing and may experience such reviews and audits of claims in the future," including that the Company was "currently subject to a claims audit with our largest third-party payor, who accounted for approximately 80% of our gross accounts receivable as of June 30, 2021" as well as reimbursement claims submitted to another insurance company that were currently undergoing an audit.  Further, with respect to the Company's claims, Eargo represented that "[w]hile we believe the claims submitted are valid and reimbursable with these insurances companies . . . an unfavorable outcome of the ongoing audits could have a material adverse effect on our future financial results, including our revenue recognition, sales return rate and bad debt reserve."  The Q2 2021 10-Q also stated that reviews and audits of Eargo's claims by third-party payors "have resulted and could in the future result in significant delays in payment, and could result in material recoupments of previous claims paid or denials of pending or future claims" and this, in turn, "could impact our ability to recognize revenue, reduce our net sales and profitability, or result in the loss of our ability to submit claims to certain third-party payors for payment."

54.     The Q2 2021 10-Q also purported to warn that Eargo may be subject to penalties for violations of certain healthcare laws and regulations.  Specifically, in the Q2 2021 10-Q, Eargo represented that "[i]f we fail to comply with U.S. or foreign federal and state healthcare regulatory laws, we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact our reputation and business operations."

55.     The statements set forth above in ¶¶50-54 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, Eargo's insurance customers were not a sustainable driver of the Company's financial results because insurers would not cover claims for Eargo's products at the level the Company represented to investors.  In addition, a substantial portion of insurance claims that Eargo submitted to its largest third-party payor were improper and were reasonably likely to lead to regulatory scrutiny and negatively impact the Company's financial results.  As a result, the positive statements made by Eargo and the Officer Defendants about the Company's business, operations, and prospects, including its 2021 financial guidance, were materially misleading and/or lacked a reasonable basis.  In addition, to the extent the Company purported to warn of risks with regard to insurance coverage and reimbursement for Eargo's products as well as the Company's compliance with U.S. federal healthcare regulatory laws, Eargo and the Officer Defendants omitted that such risks had already materialized.

56.     Then, on September 22, 2021, after the market closed, Eargo revealed that it "is the target of a criminal investigation by the U.S. Department of Justice . . . related to insurance reimbursement claims the Company has submitted on behalf of its customers covered by federal employee health plans."  As a result of the DOJ's criminal investigation of the Company, Eargo withdrew its financial guidance for the fiscal year ending December 31, 2021.  As a result of these disclosures, Eargo's stock price declined by an additional $14.81 per share, or over 68%, from

$21.67 per share to $6.86 per share—representing a nearly 62% decline from the Company's Offering price of $18.00 per share.

## VII.   LOSS CAUSATION

57.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Eargo shares and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Eargo shares fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of Eargo shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.   CLASS ACTION ALLEGATIONS

58.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired: (a) shares of Eargo common stock in or traceable to the Company's Offering; and/or (b) shares of Eargo common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Eargo and their families and affiliates.

59.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of September 14, 2021, Eargo had over 39 million shares of common stock outstanding, owned by hundreds or thousands of investors.

60.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether Defendants violated the Securities Act and/or the Exchange Act;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Eargo common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

61.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

62.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

64.     Eargo's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

65.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Eargo who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or

relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.      **PRESUMPTION OF RELIANCE**

66.      At all relevant times, the market for Eargo common stock was an efficient market for the following reasons, among others:

(a)      Eargo shares met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)      As a regulated issuer, Eargo filed periodic public reports with the SEC and NASDAQ;

(c)      Eargo regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Eargo was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

67.      As a result of the foregoing, the market for Eargo shares promptly digested current information regarding Eargo from all publicly available sources and reflected such information in the price of Eargo common stock.  Under these circumstances, all purchasers of Eargo common stock during the Class Period suffered similar injury through their purchase of Eargo common stock at artificially inflated prices and the presumption of reliance applies.

68.      A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Eargo's business operations—information that Defendants were obligated to disclose—positive proof of reliance is

not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of insurance coverage for the Company's hearing aid products, that requirement is satisfied here.

## COUNT I

**For Violations of Section 11 of the Securities Act
Against All Defendants**

69.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

70.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Eargo common stock sold pursuant or traceable to the Offering, and who were damaged thereby.

71.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

72.     Eargo is the registrant for the Offering.  The defendants named herein were responsible for the contents and dissemination of the Offering Materials.

73.     As the issuer of the shares, Eargo is strictly liable to Plaintiff and the Class for the misstatements and omissions contained in the Offering Materials.

74.     Liability on this Count is predicated on the Individual Defendants' signing of the Registration Statement for the Offering, and all Defendants' respective participation in the Offering, which was conducted pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

75.     Plaintiff purchased shares in and/or traceable to the Offering.

76.     The value of Eargo common stock has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired Eargo common stock in and/or traceable to the Offering.

77.     Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

78.     By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class pursuant to Section 11(e).

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

79.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

80.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Eargo common stock in and/or traceable to the Offering, and who were damaged thereby.

81.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

82.     The Underwriter Defendants were statutory sellers of Eargo shares that were registered in the Offering pursuant to the Registration Statement and sold by means of the Offering Materials.  By means of the Offering Materials, the Underwriter Defendants sold millions of Eargo shares through the Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants

were sellers, offerors, and/or solicitors of sales of the stock that was sold in the Offering by means of the materially false and misleading Offering Materials.

83.     The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose materials facts, as set forth above.

84.     Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

85.     By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased or otherwise acquired Eargo common stock in and/or traceable to the Offering, and who were damaged thereby.

## COUNT III

### For Violations of Section 15 of the Securities Act
### Against the Individual Defendants

86.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

87.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Eargo common stock in and/or traceable to the Offering, and who were damaged thereby.

88.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

89.     As set forth in Count One above, Eargo is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the Offering Materials.

90.     The Individual Defendants, by virtue of their positions, voting power, ownership, rights as against Eargo, and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Eargo within the meaning of Section 15 of the Securities Act.  These defendants also had the power and influence, and exercised the same, to cause Eargo to engage in the acts described herein, including by causing Eargo to conduct the Offering pursuant to the Offering Materials.  The Company, meanwhile, controlled the Individual Defendants and all of its employees.

91.     By reason of the foregoing, the defendants named herein each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Counts One and Two above, based on their having signed or authorized the signing of the Registration Statement and/or having otherwise participated in the process that allowed the Offering to be successfully completed.  The defendants named herein are liable for the aforesaid wrongful conduct and are liable, to the same extent Eargo is liable under Section 11 of the Securities Act, to members of the Class who purchases or otherwise acquired Eargo common stock sold pursuant or traceable to the Offering, and who were damaged thereby.

## COUNT IV

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Eargo and the Officer Defendants**

92.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

93.     During the Class Period, Eargo and the Officer Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Eargo shares at artificially inflated prices.

94.     Eargo and the Officer Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business

which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Eargo shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

95.     Eargo and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

96.     During the Class Period, Eargo and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     Eargo and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Eargo and the Officer Defendants engaged in this misconduct to conceal Eargo's true condition from the investing public and to support the artificially inflated prices of the Company's shares.

98.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Eargo shares.  Plaintiff and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for Eargo shares had been artificially inflated by these defendants' fraudulent course of conduct.

99.     As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

100.     By virtue of the foregoing, Eargo and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT V

### For Violations of Section 20(a) of the Exchange Act
### Against the Officer Defendants

101.  Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

102.  The Officer Defendants acted as controlling persons of Eargo within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Eargo, the Officer Defendants had the power and ability to control the actions of Eargo and its employees.  By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.  PRAYER FOR RELIEF

103.  WHEREFORE, Plaintiff prays for judgment as follows:

(a)  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)  Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.  JURY DEMAND

104.  Plaintiff demands a trial by jury.

DATED: November 10, 2021

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:      (310) 819-3470

-and-

JOHN RIZIO-HAMILTON
(johnr@blbglaw.com)
HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:      (212) 554-1400
Fax:      (212) 554-1444

*Counsel for Plaintiff IBEW Local 353
Pension Plan*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Kim Macpherson, on behalf of IBEW Local 353 Pension Plan ("Local 353"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chief Executive Officer of Toronto Electrical Industry Benefit Administration Services and am fully authorized to execute this Certification on behalf of Local 353. I have reviewed the complaint and authorize its filing by counsel.

2. Local 353 did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Local 353 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Local 353's transactions in the Eargo, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Local 353 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Reidinger v. Zendesk,* No. 19-cv-06968 (N.D. Cal.)
   *Kolominsky v. Root, Inc.,* No. 21-cv-1197 (S.D. Ohio)
   *In re Vroom, Inc. Securities Litigation,* No. 21-cv-02477 (S.D.N.Y.)
   *Burbige v. ATI Physical Therapy, Inc. f/k/a Fortress Value Acquisition Corp. II,*
   No. 21-cv-4349 (N.D. Ill.)

6. Local 353 has served as a representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *IBEW Local 353 Pension Plan v. FibroGen, Inc.,* No. 21-cv-03396 (N.D. Cal.)

7. Local 353 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 353's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 10th day of November, 2021.


_____
Kim Macpherson
Chief Executive Officer
*Toronto Electrical Industry Benefit*
*Administration Services*

**IBEW Local 353 Pension Plan**
**Transactions in Eargo, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 10/16/2020 | 6,777 | 18.0000 |
| Purchase | 10/16/2020 | 2,583 | 36.0000 |
| Purchase | 3/22/2021 | 401 | 48.6435 |
| Purchase | 3/23/2021 | 104 | 53.8093 |
| Purchase | 3/26/2021 | 684 | 43.8504 |
| Purchase | 3/29/2021 | 1,216 | 44.5199 |
| Purchase | 7/12/2021 | 351 | 34.1851 |
| Purchase | 7/13/2021 | 1,632 | 35.3057 |
| Purchase | 7/14/2021 | 448 | 33.3750 |
| Purchase | 7/14/2021 | 1,308 | 33.5951 |
| Purchase | 7/15/2021 | 1,202 | 34.3153 |
| Purchase | 7/16/2021 | 1,006 | 35.5649 |
| Purchase | 8/13/2021 | 1,473 | 25.2382 |
| Purchase | 8/16/2021 | 4,037 | 25.1987 |
| Purchase | 8/17/2021 | 2,435 | 24.6702 |
| Purchase | 9/7/2021 | 3,454 | 21.1273 |
| Sale | 12/8/2020 | (178) | 48.6225 |
| Sale | 12/22/2020 | (964) | 56.4693 |
| Sale | 3/1/2021 | (156) | 60.7318 |
| Sale | 6/25/2021 | (514) | 38.2798 |